# UNITED STATES DISTRICT COURT,
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARK BRAY | ) | |
|     *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WORCESTER POLYTECHNIC | ) | Case |
| INSTITUTE | ) | |
|     *Defendant* | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY AND

## INJUNCTIVE RELIEF AND JURY DEMAND

### Introduction

This is a civil rights action under G.L. c. 151B, The Fair Housing Act, a Title IX Act violation, a Massachusetts Civil Rights Act Violation, and multiple other claims relating to the various acts and statements of the Defendant taken in their effort to defame, discredit, and drive plaintiff Mark Bray ("Bray") out of the ability live at WPI and the ability to graduate with honors with his graduating class on May 20, 2021, along with issuing other sanctions against Bray.

This case relates to the disciplinary charges brought by WPI through Eliza Smith (hereinafter "Ms. Smith") in relation to an alleged incident at a party on November 7, 2020 where Ms. Smith accused Bray of touching her breast at an off-campus party. On February 17, 2021, Bray received a letter from Emily Perlow, Assistant Dean of Students (hereinafter "Dean Perlow"),

informing him that he was being charged with the three violations of the WPI Code of Conduct whereby he allegedly toughed Ms. Smith's breast at a party on or about November 7, 2020. After receiving the notice, Bray was called for an administrative hearing with Dean Perlow.  The matter was not resolved after hearing the facts of the case and talking to witnesses present at a party on November 7, 2020. Bray was informed of a scheduled Campus Hearing Board ("CHB") hearing on April 1, 2021 in two separate emails from Bernice Lisk, Executive Assistant to the Vice President for Student Affairs & the Dean of Students.  The first included the date of the scheduled hearing (Thursday, April 22, 2021 at 5:15 pm) and the Zoom link.  The second repeated this information, and also included the names of the Hearing Board chair, the Voting Board members,  Voting Board alternates, and the case officer. Bray was heard before a CHB panel of five voting members on Thursday, April 22, 2021.  This panel consisted of Caitlin Keller (administrative board member), Professor John Sanbonmatsu (faculty board member), Gillian Smith (faculty board member), Micah Wilde (student board member), and Jameel Gammal (student board member). Per the WPI Code of Conduct, Bray was presumed to be not responsible unless Ms. Smith met her burden of proving the violations by a preponderance of the evidence. Between April 22, 2021 and early morning April 23, 2021, the voting members of the WPI CHB found Bray to be responsible for all three charges against him, imposing on him several sanctions, including removal from campus community, forced participation in an intimate partner abuse education program, a removal of Bray from consideration of any academic honors or awards associated with WPI, a deferred disciplinary suspension, and an inability of Bray to graduate with his class on May 20, 2021.

Bray had an been a student in good standing at WPI and is due to graduate with honors. He is on the track team, has been vetted as an Resident Adviser, and hopeful to attend medical

school.  By contrast,Defendant puts profits first, has discriminated against a minority, and has retaliated against Plaintiff for asking for a fair appeal process.  Defendant's efforts culminated in a sham peer review that now threatens to destroy Bray's livelihood and ability to be admitted to medical school.

Plaintiff seeks declaratory and injunctive relief, including temporary and permanent restraining orders, to prevent WPI from imposing its sanctions levied against Bray. Plaintiff seeks a temporary restraining order and preliminary injunction because he is likely to succeed on the merits, and is likely to suffer irreparable harm in the absence of such relief. The balance of equities tips in favor of the Plaintiffs and an injunction is in the public interest. Winter v. Nat. Res. Def. Counsel, Inc., 555 U.S. 7, 20 (2008).

## Parties

1.  Bray is a natural person with a residence at 33-3 Yorkshire Terrace, Shrewsbury, Massachusetts 01545.

2.   Worcester Polytechnic Institute ("WPI") is a private research university in Worcester, Massachusetts, focusing on the instruction and research of technical arts and applied sciences. WPI's ' corporate headquarters  and principal  place of business are at 100 Institute Road, Worcester, Massachusetts 01609-2280. Its President and Corporate Officer is Laurie A. Leshin, 1 Drury Lane, Worcester, Massachusetts 01609.

## Jurisdiction and Venue

1. Jurisdiction is conferred by 28 U.S.C. § 1651 (writs), § 1331 (federal question), § 1361 (compel agency to act or not act) § 2201, § 2202; 42 U.S.C. § 1983 (deprivation of rights under color of law) and 5 U.S.C. § 702 (legal wrong suffered because of agency action).

2. Venue is appropriate under 28 U.S.C. § 1391(e).


**<u>Statement of Facts</u>**

1. On the night of Saturday, November 7, 2020, Bray, who is a black man, attended a party at an apartment jointly owned by Matthew Adiletta, Sean Kane, Owen Carlstrom, and Oliver Thomas.

2. Matthew Adiletta and Oliver Thomas are Bray's teammates on the track team.

3. The complainant, Ms. Smith, was present at the party.

4. Ms. Smith is a white woman.

5. Bray knew Ms. Smith as he was her Resident Adviser (RA) during A-term 2019, for a 7-week period, in Faraday Hall.

6. At the party, Bray consumed a small to moderate amount of alcohol. Bray did not consume any alcohol before the party.

7. At all times, Bray was coherent.

8. At the party, Bray spoke briefly with Ms. Smith.

9. Ms. Smith was Bray's former resident, and he was uneasy socializing with a former resident, particularly in a social setting where she was drinking underage.

10. Bray wanted to be sure that she did not find the situation inappropriate.

11. Per his recollection, he asked what she thought of drinking in a social setting with her former RA.

12.   Ms. Smith replied to confirm that she did not have a problem with it.

13.   This conversation happened in a small group setting.

14.   Bray never talked with Ms. Smith in a private setting, nor was he ever alone with her.

15.    Bray later talked with Ms. Smith in a group that had gathered in the hallway of the apartment.

16.   Bray was unsure how long the group stayed in the hallway, but he estimated that the group conversed for about an hour.

17.   Ms. Smith was intoxicated at the party.

18.   Ms. Smith was at times quite loud at the party, sometimes shouting her incoherent statements and acting obnoxiously.

19.   Bray had no other interactions of note with Ms. Smith during this party.

20.   On Thursday, November 12, Matthew Adiletta called Bray to discuss what he termed "rumors" floating around about Bray.

21.   Bray went back to Matthew Atiletta's apartment.

22.   Both Atiletta and Oliver told Bray that Ms. Smith was alleging Bray grabbed her breast at the party.

23.   Bray was shocked, as he had no memory of this.

24.   Both Atiletta and Oliver also expressed shock, as this was so far out of Bray's character.

25.   Both Atiletta and Oliver said that no one witnessed this.

26.   Atiletta recommended Bray apologize, and that Bray not deny the incident.

27.   Out of confusion, and because Bray felt so guilty over the idea that anything like the described incident may have happened, Bray asked Oliver to call Ms. Smith.

28.   Oliver called Ms. Smith on Snapchat audio.

29.  Bray told Ms. Smith that he did not remember the incident.

30.  Ms. Smith was angry at the conversation and did not accept the apology.

31.  At that time, Ms. Smith told Bray that she was still deciding as to whether she wanted to raise an official complaint.

32.  In the following months, there have been no eye-witnesses to the alleged incident, and no witnesses who have seen Bray engage in any similar incidents.

33.  Section V(B)4 of the WPI Code of Conduct states as follows:

Be presumed not responsible of the alleged conduct unless the available information establishes otherwise, by the Preponderance of the Evidence standard, after they have received notice of allegations and had an opportunity to respond;

34.  Section V(F) of the WPI Code of Conduct states as follows:

**INFORMATION GATHERING**

In certain instances, additional information gathering or investigation may be needed after the Complaint is received. Such information gathering may be conducted by the Dean of Students Office or other WPI staff. In appropriate circumstances, information gathering may occur in cooperation with the WPI Police Department, academic departments, and other relevant offices, agencies, and departments. Information gathering may include interviewing witnesses or victims and reviewing information relevant to the Complaint.

35.  Section V(K) of the WPI Code of Conduct states as follows:

**SANCTIONS**

Violations of WPI policy are addressed through sanctions, which can take several forms, as noted below. Sanctions may be issued by the Conduct Officer or by the CHB panel and may apply to students, student organizations, or varsity athletic teams. Sanctions may include but are not limited to:

1. Disciplinary Warning. This status indicates that a student, student organization, or varsity athletic team's behavior violated WPI policy and that further similar behavior may result in more serious disciplinary action. Warnings are a prompt to consider behavior more carefully in the future.

2. Disciplinary Probation. This status indicates that a student, student organization, or varsity athletic team has violated an important expectation of community membership. Probation communicates that urgent action and significant change are required, and a warning that continued inappropriate behavior may result in disciplinary suspension or

expulsion. During the probation period, students, student organizations, and varsity athletic teams are directed to take active steps toward improving their behaviors and to demonstrate that they can uphold the standards of the WPI community. Disciplinary probation lasts for a specified period of time.

The probationary period may be accompanied by a loss of privileges including without limitation ineligibility to hold certain campus employment and leadership roles, ineligibility to study abroad, ineligibility to participate in varsity athletics and other extracurricular activities.

3. Disciplinary Suspension. Suspension communicates that the Respondent's behavior was inconsistent with the mission and values of WPI and that the Respondent must take time to reflect and change in order to return to the academic community. A suspended student may not be on campus or participate in any aspect of WPI life, including but not limited to classes, co-curricular organizations, fraternities and sororities, research, campus events, on-campus or WPI-recognized housing, and employment.

(a) Respondents may be required to complete additional sanctions or action items while suspended in order to be considered for readmission to WPI. Readmission is coordinated through the Dean of Students Office and is contingent upon satisfaction of all requirements stated in the original or appealed sanction.

(b) A student who is suspended after having satisfied all degree requirements will not be awarded their degree until the period of suspension is over and they have met all conditions for re enrollment. The student may not participate in Commencement exercises until the period of suspension is over and they have been approved to reenroll by meeting all the terms of the suspension.

4. Disciplinary Expulsion. Expulsion is permanent dismissal from WPI without the possibility of readmission or reinstatement in the future. Expulsion communicates that the Respondent's behavior was fundamentally inconsistent with the mission and values of WPI and the Respondent is no longer eligible to be a part of the WPI community. Expulsion results in the forfeiture of all rights and degrees not conferred at the time of the expulsion. Expulsion disqualifies a student from participation in campus activities including classes and social events. Students who are expelled are not permitted to be on campus at any time for any reason.

5. Removal from or Relocation within On-Campus Housing. A student may lose the privilege to reside in on-campus housing or to reside in a specific residence hall, house, building, or other residence.

6. Loss of Privileges. A student may lose privileges for a specified period, including the eligibility to have a car on campus, parking privileges, participation in certain events, access to electronic resources, access to residence halls, or use of WPI-owned equipment. Loss of privileges also may entail the loss of membership or leadership positions such as student staff positions or positions on athletic teams.

7. <u>Restitution.</u> Restitution is the payment for all or a portion of injury or damage caused by an  individual or a group.

8. <u>Substance Abuse Assessment</u>. Students may be assigned to obtain a substance abuse assessment  from an appropriate professional. The student will typically be required to complete any education  or treatment that is recommended as a result of the assessment.

9. <u>Participation in a Workshop, Training, Course, or Seminar.</u> Students, student organizations, and  varsity athletic teams may be required to complete an educational program. Such programs  may  include plagiarism prevention tutorials, bystander intervention training, workshops about hazing  prevention, an Academic Integrity Seminar, or other relevant educational program.

10. <u>Required Writing Project.</u> Students, student organizations, or varsity athletic teams may be assigned  to complete written reflections or projects. Such projects may include reflection essays, proposals to  address a campus issue, research reports, or other written projects. Written projects are expected  to exhibit the quality of writing expected of WPI students.

11. <u>Personal Accountability Plan.</u> Students may be assigned to consider the factors that led to the  violation and to create personal, academic, professional, and/or other goals to avoid future  violations. A Personal Accountability Plan typically includes required metrics to assess progress  toward a student's stated goals and follow-up meetings to discuss progress.
12. <u>Required Meeting(s) with the Dean of Students Office.</u> Students, student organizations, and varsity  athletic teams may be required to attend one or more meetings with the Conduct Officer or another advisor in the Dean of Students Office.

13. <u>Referral to Other Offices or Services.</u> Students, student organizations, and varsity athletic teams may  be directed to meet with or attend programs facilitated by other offices on campus. Referrals may  include a meeting with an academic advisor, workshops at the Academic Resource Center, or other  relevant services.

14. <u>Restorative Actions.</u> Restorative actions require a student to repair the harms resulting from  misconduct on other members of the community. This may include letters of apology, drafting and  implementing a plan of resolution, and developing plans for reintegration. Restorative actions also  may include any plan of behavioral changes agreed to during a Restorative Conference.

15. <u>Additional Sanctions.</u> Additional sanctions (e.g., projects, community service, removal from  activities) may be imposed as appropriate.

**Defendant Put Bray Through a Sham Peer Review**

**Bray's accuser, Ms. Smith, served on the very same committee and participated in peer reviews that ultimately decided against Bray.**

### Standard of Proof

*Bray's hearing did not meet due process standards, and so the finding of responsibility should be overturned.*

Bray was not granted the presumption of being not responsible, and thus the hearing failed to meet due process standards and so the finding of responsibility should be overturned.

36. In order to prove by a preponderance of the evidence that Bray was responsible, Ms. Smith had the burden of overcoming the presumption that Bray was not responsible for the alleged harm.

37. The clear bias shown during the hearing indicates that the standard was effectively reversed.

38. Bray was forced to prove by a preponderance of the evidence that he was not responsible, instead of Ms. Smith being forced to prove by a preponderance of evidence that he was responsible, which is a clear violation of the WPI Code of Conduct.

39. No witness accounts indicated that Bray touched the complainant.

40. No witness accounts indicated that Bray ever engaged in similar behavior.

41. Robert Dec, whose account is the closest statement to a direct witness account, stated that he saw "something" happen in the vicinity of Ms. Smith and Bray, and that Ms. Smith reacted by yelling at Bray.

42. Dec repeatedly said that he does not know what happened or whether Bray was responsible.

43.  The logistics of the alleged harm (that Bray was able to navigate putting his hand up Ms. Smith's shirt, while having his arms around my girlfriend and focusing on her, while Ms. Smith was walking, and without any individual noticing the interaction) is impossible.

44.  Bray's girlfriend, who Ms. Smith says was physically between Ms. Smith and Bray at the time of the alleged incident, did not witness any contact or any movements consistent with the alleged contact.

45.  Bray's girlfriend also confirmed that she would have noticed if Bray's attention shifted off of her and to Ms. Smith.

46.  \Notably, despite Ms. Smith's insistence that Bray's girlfriend was standing directly in front of Bray, Robert Dec states that Bray's girlfriend was not present in the hallway at the time of the alleged incident.

47.  No reasonable individual could have found, without any eyewitness evidence or any evidence corroborating Ms. Smith's story, that she reached the preponderance of the evidence threshold (that it was more likely than not that Bray did the alleged harm).

48.  The only reasonable explanation for the panel  to have found Bray responsible was that they expected him to prove the negative: that he did not engage in the alleged harm.

49.  Bray was held to a higher standard than preponderance of the evidence to prove his innocence.

50.  Bray was never afforded the presumption of innocence by the Defendant.

51.  This expectation, and this presumption of Bray's responsibility, was on display during the hearing.

52.  After Robert Dec repeatedly said he did not see whatever incident Ms. Smith reacted audibly to, Professor Sanbonmatsu said that he did not want to "put words into [Robert's]

mouth," but then asked if Robert would characterize an incident where *something* happened, as Robert had described it, as an incident where Bray was doing something to Ms. Smith.

53. Despite previously saying that he was not sure what happened, Mr. Dec agreed.

54. Professor Sanbonmatsu again asked Oliver, who described Bray as friendly when consuming alcohol (using hugs and high fives as examples), to clarify that he was acknowledging that Bray get "handsy"—a word that was never used and an allegation that Oliver never made—when drunk.

55. Another hearing officer, Gillian Smith, asked Oliver "why" he didn't remember the incident, as opposed to asking if he remembered an incident, presupposing that there was an incident which he should have remembered.

56. Professor Sanbonmatsu, under the guise of clarifying why Bray felt "awful" about the accusations, asked Oliver to confirm that this was actually Bray admitting that he might have drunk enough to have blacked or browned out.

57. Professor Sanbonmatsu repeatedly cast doubt on two witnesses' accounts that Bray apologized out of a sense of duty and fear of having harmed someone.

58. While both Oliver and Matthew credited Bray's good character as the reason he was quick to offer an apology to Ms. Smith, Professor Sanbonmatsu challenged both witnesses as he personally did not apologize for things he did not do.

59. At the hearing, Caitlin Ashley Keller asked Matthew why he was involved in the Snapchat audio call, given that he was not friends with Ms. Smith, completely disregarding the fact that Matthew had established his friendship with Bray and was on the call to offer Bray support.

60.    The reversal of the standard and the shifting of the burden of proof onto Bray, as demonstrated by both the outcome and by the manner in which justices asked questions, was such to presume Bray to be responsible.

61.    This is in violation of Bray's right under the WPI Code of Conduct to be presumed not responsible. Because of this violation, the hearing failed to meet due process standards, and so the finding of responsibility should be overturned.

Bray was not granted a fair and impartial hearing, and thus the hearing failed to meet due process standards and so the finding of responsibility should be overturned.

62.    In order to prove by a preponderance of the evidence that Bray was responsible, Ms. Smith had the burden of overcoming the presumption that he was not responsible for the alleged harm. In order to meet this standard, the hearing must be fair and impartial. Because Bray was not heard in front of a fair and impartial Campus Hearing Board panel, WPI and Ms. Smith did not meet this evidentiary standard.

63.    *Bray was firstly objectively and comparatively denied resources ahead of time and during the hearing that rendered the hearing unfair and partial.*

64.    Bray was provided a school-assigned advisor, Ms. Tracy Baldelli, who under-prepared him Ms. Smith, a CHB justice herself and someone who routinely sits on the hearing panel, offered a brief opening statement about the charges and incident.

65.    Bray, on his advisor's advice, offered a longer opening statement which spoke to his credibility and to the circumstances surrounding the incident. Bray was repeatedly cut off mid-statement by the chair, Professor Joel Brattin.

66.    Bray's lack of resources was objectively unfair, but was also unfair compared to the resources Ms. Smith was allotted.

67. Ms. Smith, firstly, worked extensively with Dean Perlow (something a complainant may do, but is not guaranteed) not only to discuss the case, but to determine the appropriate charges.

68. Dean Perlow, the dean of the college, was on the board to render a decision.

69. Additionally, Ms. Smith is a CHB justice and closely works with Dean Perlow.

70. This role inherently made her better-prepared and created a presumed bias of her credibility. It also gave her a credibility boost before the hearing even began.

71. There is no evidence that she did not have communication with other panel members over the course of the process.

72. It can further be presumed that she knew the permanent members (Professor Brattin, the two faculty justices, and the one administrative justice) as colleagues in this role.

73. At no point did the hearing panel who had worked with Ms. Smith previously on the hearing panel offer to recuse themselves.

74. Bray was objectively denied respect during the hearing, such to make the hearing unfair and partial. Situations where he was cut off and dismissed implied that he was somehow in the wrong procedurally and substantively. This unfairly undercut his credibility in front of the voting members of the panel. These issues were exacerbated given the level of respect and deference Ms. Smith was allotted.

75. As mentioned, Ms. Smith gave a short opening statement, whereas Bray's statement regarding his character and credibility was cut off twice: once by the chair and once by an alternate.

76. Bray was not in violation of any official rules, as there is no time limit nor content guidance around opening statements.

77.   Bray was unable to ask all of his questions and faced numerous interruptions when speaking.

78.   Bray asked Oliver Thomas, who Ms. Smith described as my "close friend" in her hearing packet, a series of questions to establish our level of friendship.

79.   Bray stated the purpose of the line of questions upfront.

80.   The chair often interrupted Bray to redirect his questions back to the incident.

81.   The dismissive tone and inability to effectively present his case was carried throughout.

82.   The panel repeatedly questioned why Bray would apologize if he wasn't responsible, despite numerous explanations as to his stated mindset, is speculative and provocative. Taken as a whole, it created an unfair and partial hearing.

83.   Professor Sanbonmatsu also repeatedly mischaracterized and dismissed any mention of race in relation to the case, undermining Bray's credibility and his arguments.

84.   Professor Sanbonmatsu erroneously disregarded the fact that racism could be a factor simply because witness Anika did not hear Ms. Smith say something overtly racist.

85.   Enyo, who served as a character witness, also addressed this point, emphasizing that Black Professor Sanbonmatsu's dismissal of these concerns was not only unfairly prejudicial to my witnesses and to Bray's arguments, but it was also a clear disregard for the facts.

<u>The sanctions imposed are grossly disproportionate from those which would be reasonable.</u>

86.   WPI does not make public or share with members of the community any sanctioning decisions. As such, it is impossible to gauge the "appropriateness" in comparison to other situations within the university's community.

87.     WPI's Code of Conduct features 15 possible sanctions or sanctions categories, of varying severity and with varying aims. Of these, I received four variations: deferred disciplinary suspension (a variation of "disciplinary suspension"); removal from campus community (a variation from "removal from or relocation within on-campus housing"); IPAEP - Intimate Partner Abuse Education Program (a variation of "participation in a workshop, training course, or seminar"); and removal of consideration for any awards, honors of distinction or highlights associated with WPI (under "additional sanctions"). All four are grossly disproportionate from what would be reasonable given the alleged harm, as clearly indicated by the heightened severity added in the variations.

88.     WPI offers removal from or relocation within on-campus housing as a sanction. However, Bray was not just removed from on-campus housing, or relocated; he was instead removed from campus life in its entirety. This is not a listed sanction.

89.     This not only denied Bray housing, but additionally served to hinder his classwork, involvement in sports and clubs, and ability to work on-campus jobs.

90.     The inability to access WPI's academic facilities, such as lab space, outside of pre-approved hours serves to severely impede his coursework, especially as WPI is a stem school that prides itself on seniors' Major Qualifying Projects. These are practical projects that generally require regular, frequent use of a lab to complete, as determined by the group members' joint schedules. It serves as a *de facto* suspension for everything except coursework, and unilaterally isolates the individual from their community.

91.     WPI offers disciplinary suspensions, including one for those who have satisfied all degree requirements, as he has satisfied. Such a suspension is unreasonable given the

circumstances, particularly in conjunction with the removal of consideration from honors.

<u>The sanctions imposed are not responsive to the violations alleged, and are instead exclusively punitive.</u>

92.   In the hearing, Ms. Smith said she wanted "a lesson to be learned," and recommended a course on alcohol safety, a course on sexual harassment, and counseling. The sanctions levied are not ones that Ms. Smith requested and grossly exceed those she did request.

93.   The sexual harassment course which Bray must take, Intimate Partner Abuse Education Programs (IPAEP), describes the course as the following: Intimate Partner Abuse Education Programs (IPAEP) are education programs for people who abuse their intimate partners. Your intimate partner is **the** person you decided you want to be close with, your girlfriend, your boyfriend, your husband or wife, the love of your life, your soulmate. These programs used to be called "batterer intervention."

94.   This does not address the matter at hand, nor does it teach the lessons Ms. Smith requested Bray learn.

95.   Bray's girlfriend spoke at length about how she trusts Bray, and how she knows Bray to respect her and other women. She is his only intimate partner, according to the definition of this course. While abuse covers a wide range of activity, Bray was not accused of being a "batterer."

96.   The sanctions also fail to include counseling, which Ms. Smith suggested. Her stated purpose, that a lesson be learned, is not represented in the sanctions.

97.   This sanction, then, does not offer Bray "time to reflect and change" but rather robs Bray of it as he tries to both adapt to not having a degree while also making ends meet, while

creating an impossible chance for Bray to apply to medical school, a goal that Bray aspires to complete this year.

98.    Moreover, the alleged incident took place at an off-campus apartment.

The sanctions imposed are categorically inequitable in this situation.

99.    Bray is a Black man of Ghanaian descent, studying at a predominantly white university and entering a predominantly white field.

100.    Bray works four jobs: one on-campus job, and three off-campus jobs.

101.    Bray balances his position as a student athlete with my social life, my coursework, and my two MQP projects. Despite having a particularly demanding schedule, Bray has distinguished himself such to earn accolades through my admittance to the secret society, Skull Alumni Society, and through honors such as the Two Towers Prize and Robert A. Peura Founder Scholarship in Biomedical Engineering. The sanctions imposed affect me in a uniquely disproportionate way, such to appear targeted to hurt me.

102.    *Monetarily:* Excluding Bray from campus life as a whole, firstly, forced him to find new housing, in the middle of a pandemic, on short notice. It also forced Bray out of my on-campus job, for which he served as an RA.

103.    Deferred sanctions then push Bray into the job market without a degree, and without the honors he has earned. This is unconscionable regardless, but particularly in light of his existing financial constraints, and the overall economic downturn resulting from the COVID-19 pandemic.

104.    Bray's hearing not meet due process standards, based on the denial of his right to be presumed not responsible and the denial of a hearing in front of a fair and impartial CHB panel.

105.   Bray's sanctions vary considerably from those that would be considered appropriate, as they are not responsive, are grossly disproportionate to the alleged behavior, and are categorically inequitable.

106.   Ms. Smith makes an outrageous claim; she asserts that while she was attempting to walk behind Bray's girlfriend in a narrow hallway, while Bray's girlfriend was standing directly between Ms. Smith and Bray, and while Bray's girlfriend and Bray appeared "romantically engaged" in conversation, that Bray reached through his girlfriend's armpits and grabbed Ms. Smith's breast.

107.   Ms. Smith's allegations were uncorroborated by any of the witnesses; in fact, they all state that such action is far outside of Bray's character.

108.   In effect, this is a case of one person's word versus another's; however, the presumption of innocence was not afforded to Bray based on his skin color.

109.   After the hearing, the panel issued the following against Bray: Bray was found to be responsible for all alleged charges, imposing on him several sanctions, including removal from campus community, forced participation in an intimate partner abuse education program, a removal of Bray from consideration of any academic honors or awards associated with WPI, a deferred disciplinary suspension, and an inability of Bray to graduate with his class on May 20, 2021.

110.   As such, the finding that Bray was found responsible for the alleged violations should be overturned, and the four sanctions imposed should be removed.

111.   WPI had a failure to investigate in accordance with procedures established under the Student Code of Conduct, which affirmed his right to be assumed innocent till proven guilty.

112.    The WPI judicial process is grounded on the concept of educational discipline –students understanding why specific rules are in place, taking responsibility for their actions, learning from their mistakes, considering alternative courses of action, and ultimately, changing their behavior in the future.

113.    The Hearing Board's sanctions do not accomplish this intent.

114.    There is no understanding on Bray's part about how the sanctions imposed on him aid in the amelioration of the alleged action -- an allegation that again was not proven during the hearing.

115.    Bray was offered no written record of the hearing panel's rationale for its decision and sanctions.

116.    When Bray questioned Dean Perlow following the hearing, Perlow couldn't state the reasons and hinted that "frankly" it was because Bray didn't admit guilt.

117.    *From the hearing recording that the "justices" tried to equate Bray's calling Ms. Smith to apologize as an admission of guilt, in direct contradiction of witness statements and Bray's own account.*

118.    WPI will acted "arbitrarily or capriciously" in disciplining Bray.

**THE TITLE IX STATUTE AND REGULATIONS**

119.    Title IX of the Education Amendments of 1972 states that "no person shall, on the basis of sex be . . . subjected to discrimination."

120.    Title IX is a civil rights law, coextensive with Title VI  and Title IV of the Civil Rights Act of 1964.

121.    Title IV explicitly and equally prohibits discrimination.

122.    34 C.F.R. § 106.71 states that the procedural provisions applicable to Title VI of the Civil Rights Act (34 CFR §§ 100.6-100.11) are adopted and incorporated therein.

See Title IX Legal Manual, THE UNITED STATES DEPARTMENT OF JUSTICE (last visited Jan. 30, 2014), http://www.justice.gov/crt/about/cor/coord/ixlegal.php (noting that "Congress consciously modeled Title IX on Title VI" and citing Alexander v. Choate, 469 U.S. 287, 294 (1985) for the proposition that because Title IX and Title VI contain parallel language, the same analytic framework should apply in the context of administrative redress proceedings because both statutes were enacted to prevent unlawful discrimination and to provide remedies for the effects of past discrimination); U.S. DEPARTMENT OF JUSTICE, findings letter against the University of New Mexico, (April 22, 2016) (noting that Title IX, Title VI, and Title IV are coextensive civil rights laws); https://www.justice.gov/opa/file/843901/download; Justice Department Announces Investigations of the Handling of Sexual Assault Allegations by the University of Montana, the Missoula, Mont., Police Department and the Missoula County Attorney's Office, DEPARTMENT OF JUSTICE (May 1, 2012), http://www.justice.gov/opa/pr/2012/May/12-crt-561.html (announcing Title IX compliance review and Title IV investigation of the University of Montana and noting, "Title IX of the Education Amendments of 1972 and Title IV of the Civil Rights Act of 1964 each prohibit sex discrimination, including sexual assault and sexual harassment in education programs"); Resolution Agreement, http://www.justice.gov/crt/about/edu/documents/ montanaagree.pdf (announcing resolution agreement with the University of Montana and noting that Title IV and Title IX are subject to the same regulations to ensure enforcement of rights regarding discrimination, harassment, and violence in education "on the basis of sex." 28 C.F.R. Part 54 and 34 C.F.R. Part 106). See also the Civil Rights Restoration Act of 1987, which made clear that substantive standards from Title VI apply with equal force to Title IX, 20 U.S.C. § 1687; 29 U.S.C. § 794, 42 U.S.C. § 2000d-4a, and 42 U.S.C. § 6101.6 on the basis of sex, race, and national origin in public schools.

123. Title IX applies to public and private schools that receive federal funds.

124. Title IX was modeled after Title VI of the Civil Rights Act of 1964, which provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 42 U.S.C. §§ 2000d - 2000d-7.

125. Title IX uses exactly the same enabling language and states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681(a).

126.   Discrimination on the basis of sex includes sex/gender-motivated harassment and violence. Sexual assault is always a form of sexual harassment; however, it may not be defined using criminal law labels and definitions.

127.   This is because conduct that meets the criminal definition of "sexual assault" more than satisfies the meaning of "unwelcome;" however, conduct that is "unwelcome" may not rise to the more onerous elemental requirements of the criminal definition

128.   Title IV prohibits discrimination in identified public entities, including schools and other "federally assisted programs," on the basis of "race, color, sex, religion or national origin."

42 U.S.C. §§ 2000c through 2000c-9; Equal Educational Opportunities Act of 1974, Title II, 20 U.S.C. §§ 1701-1758. 11 Letter from Russlynn Ali, Assistant Secretary for Civil Rights, Department of Education, Office for Civil Rights (October 26, 2010) ("The label used to describe an incident (e.g., bullying, hazing, teasing) does not determine how a school is obligated to respond. Rather, the nature of the conduct itself must be assessed for civil rights implications. So, for example, if the abusive behavior is on the basis of race, color, national origin, sex, or disability, and creates a hostile environment, a school is obligated to respond in accordance with the applicable federal civil rights statutes and regulations enforced by OCR."); Education & Title IX, NATIONAL WOMEN'S LAW CENTER (last visited Jan. 29, 2014), http://www.nwlc.org/our-issues/education- %2526-title-ix. 7 of sexual assault. Whether conduct is covered by Title IX is determined by the behavior, not the label used to describe the behavior.

129.    The controlling Title IX standard asks simply whether words or conduct of a sexual or gender-based nature were "unwelcome." "Unwelcome" means that which was not requested or invited, and which an individual considered to be "undesirable or offensive."

130.   Title IX covers student-on-student sexual assaults. Davis v. Monroe, 526 U.S. 629 (1999).

131.   The Title IX regulation states that "no person shall, on the basis of sex be . . . subjected to discrimination." 34 C.F.R. part 106.31(a).

132.  The Title IX regulation states that a school "shall not, on the basis of sex," inter alia, "treat one person differently from another in determining whether such person satisfies any requirement of condition for the provision of such aid, benefit, or service; provide different aid, benefits or services in a different manner; deny any person such aid, benefit, or service." 34 C.F.R. part 106.31(b)(1-7).

133.  The Title IX regulation states that a school shall not on the basis of sex "subject any person to separate or different rules of behavior, sanctions, or other treatment, or otherwise limit any person in the enjoyment of any right, privilege, advantage or opportunity." 34 C.F.R. part 106.31(b)(1-7).

134.  The Title IX regulation states that a school "shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action, which would be prohibited by Title IX. 34 C.F.R. part 106.8(b)."

135.  Equitable redress is also mandatory under Title IV14 and Title VI.15

136.  The Title IX regulation states that, a school shall implement specific and continuing steps to notify students and employees that it does not discriminate on the basis of sex and that it is required by Title IX not to discriminate in such a manner. "Such notification shall state that the requirement not to discriminate extends to employment and that inquiries regarding the application of Title IX may be referred to the designated employee or to the Assistant Secretary for Civil Rights at the Department of Education." 34 C.F.R. part 106.9(a).

137.  The Title IX regulation states that, "A school shall not use or distribute a publication, which suggests by text or illustration that such school treats applicants, students or employees differently on the basis of sex." 34 C.F.R. part 106.9(b)(2).

138.   The WPI Student Code of Conduct violate Title IX.

139.   The WPI rules in their entirety violate Title IX and 34 C.F.R. part 106.31(a) because they permit schools to treat civil rights harms differently on the basis of sex.

140.   The WPI rules violate Title IX by permitting WPI to apply a burden of proof more onerous than preponderance of the evidence to determine whether a sex-based civil rights harm occurred.

141.   The WPI rules do not permit to apply a burden of proof more onerous than preponderance to determine whether civil rights harms occurred on the basis of other protected class categories, such as race and national origin.

142.   Application of the preponderance standard has been required under civil rights laws.

143.   WPI claimed it also a preponderance of the evidence standard when it resolves complaints against recipients, although in effect a higher standard was held to Bray.

144.   "Grievance procedures that use [a] higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX.

145.   That Title IX's mandate of equitable treatment requires application of the preponderance standard was acknowledged during congressional hearings related to the enactment of the Campus SaVE Act, which was a 2013 amendment of the Clery Act.

146.   The WPI rules violate Title IX and 34 C.F.R. part 106.31(b)(1-7) because they subject victims of sex-based harms to different treatment compared to other civil rights harms, with regard to aids, benefits, and/or services.

147.   The WPI rules violate Title IX and 34 C.F.R. part 106.31(b)(1-7) because they subject victims of sex-based harms to separate and different rules of behavior, sanctions, or other treatment, compared to other civil rights harms.

148.   The WPI rules violate Title IX and 34 C.F.R. part 106.31(b)(1-7) because they limit victims of sex-based harms in the enjoyment of their rights, privileges, advantages, and opportunities, compared to victims of other civil rights harms.

149.   The WPI rules violate Title IX and 34 C.F.R. part 106.8(b) because they permit schools to apply an evidentiary burden of proof more onerous than a preponderance of the evidence when responding to and redressing sex-based harms, but not when responding to and redressing other civil rights harms, thus subjecting victims of sex-based harms to different, discriminatory, and inequitable treatment for the resolution of student and employee complaints alleging any action, which would be prohibited by Title IX.

150.   The WPI rules violate of 34 C.F.R. part 106.8(b) because they state that the burden of proof applied in sex-based civil rights cases should be the same as that which is applied in non-civil rights student misconduct matters rather than civil rights matters, thus subjecting victims of sex-based harms, but not other civil rights harms, to different.

## THE WPI RULES VIOLATE MASSACHUSETTS LAW

151.   Massachusetts General Law, chapter 93, § 102, the Massachusetts Equal Rights Act, guarantees females the full and equal benefit of all laws and proceedings for the security of persons …" 38.

152.   For the reasons set forth in the facts above, the WPI rules violate Massachusetts General Law, chapter 93, § 102. 39.

153.    The Equal Protection Clause of the Massachusetts Constitution prohibits discriminatory and unequal treatment based on sex. (Massachusetts Constitution, Part 1, Article I).

154.    Claims of sex/gender discrimination under the Massachusetts Constitution are subject to strict scrutiny. Commonwealth v. King, 374 Mass. 5, 21 (1977).

155.    For the reasons set forth in the facts above, the WPI rules violate Massachusetts Constitution, Part 1, Article I.


**COUNT I VIOLATION OF G.L. c. 51B, THE FAIR HOUSING ACT**

156.    Bray incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

157.    At all relevant times, Bray was a resident living at WPI defined under M.G.L. c 51B.

158.    At all relevant times, Defendant WPI, had the authority to take corrective action to not discriminate against Bray because of the color of his skin.

159.    WPI  acted in bad faith and retaliated against Bray by engaging in a campaign to defame Bray, interfere with Bray's business relations, terminate his relationship with WPI and exclude him from the campus, including the housing, and, most egregiously, prosecute a sham peer review hearing that resulted in his improper suspension from WPI.

160.    The actions of WPI are unlawful and in violation of G.L. c. 51B,

161.    WPI are responsible for the actions of its administrators in violation of this statute.

162.    As a direct result of the violation of G.L. c. 51B, Bray suffered damages in an amount to be proven at trial.

163.    WPI is liable the damages they have caused and continue to cause.

## COUNT II DEFAMATION

164. Bray incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

165. As set forth above, Defendant WPI acted in bad faith and published statements of and concerning Bray that damaged Bray's reputation in the community. These statements were made with actual malice and with the intent to damage Bray's reputation in the community.

166. Defendant knew this information was false, had no reason to believe it was true, acted in reckless disregard of the truth and Bray's rights, and published this assertion unnecessarily, unreasonably, and excessively. Instead, these Defendants acted out of malice towards Bray as part of their campaign to force Bray out of WPI.

167. In so doing, Defendant has destroyed Bray's good name and reputation. The consequences to Bray have been devastating. His professional career, personal life, as well as his emotional, mental and physical health have been severely damaged.

168. WPI is liable for the damages they have caused and continue to cause.

## COUNT III

## BREACH OF CONTRAC T

169. Bray incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

170. At all relevant times, Bray and WPI were operating under WPI's Code of Conduct with respect to a hearing.

171. As described above, WPI acted in bad faith and engaged inunfair and deceptive acts and

practices when it deliberately breached the WPI Code of Conduct on multiple occasions.

172.   WPI willfully and knowingly engaged in these acts and practices.

173.   More specifically, Defendant engaged in a campaign to defame, discredit,and ultimately drive WPI out of the university.  Defendant acted with malicious intent in doing so.

174.   Bray has been harmed by these actions by, <u>inter alia,</u> lost income, loss ofgoodwill, reputation, and consulting engagements in an amount to be proven at trial.

175.   WPI is liable for the damages they have caused and continue to cause.

## **COUNT IV**

## **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

176.   Bray incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint. The agreements between Bray and WPI carried with them an implied covenant of good faith and fair dealing.

177.   WPI acted in bad faith and breached the covenant of good faith andfair dealing in respect to this agreement by conducting a campaign to defame, discredit, and

drive Bray out of WPI. This included, <u>inter alia,</u> initiating and prosecuting the sham hearing, suspending and terminating Bray's involvement with WPI, and making false and/or defamatory reports to third parties.

178.   As a direct and proximate result of WPI's acts in breaching thiscovenant, Bray has suffered damages in an amount to be proven at trial.

179.   WPI is liable for the damages they have caused and continue to cause.

## **COUNT V**

## TORTIOUS INTERFERENCE WITH BUSINESS

## RELATIONSHIPS

180. Bray incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

181. Bray had and has economic and contractual relationships with both the university and outside businesses.

182. WPI knew of these relationships.

183. With improper purpose and means, Defendant acted in bad faith and knowingly and intentionally interfered with these relationships, and induced and prevented Bray from proceeding with and benefitting from the value of these business relationships and related goodwill.

184. Bray has been damaged by the interference by, _inter alia,_ lost income, loss of goodwill, reputation, and consulting engagements in an amount to be proven at trial.

185. WPI is liable for the damages they have caused and continue to cause.

## COUNT VI

## TORTIOUS INTERFERENCE WITH PROSPECTIVE

## ECONOMIC ADVANTAGE

186. Bray incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

187. WPI has interfered with the prospective contractual and advantageous relationship between the Bray and future employers.

188. WPI has knowledge of the prospective contractual and advantageous relationship

between Bray and potential employers.

189.   With improper purpose and means, these Defendants acted in bad faith and knowingly and intentionally interfered with this relationship and prevented Bray from receiving a degree in good standing to be able to obtain employment.

190.   Bray has been damaged by the interference by, <u>inter alia,</u> lost income, lossof goodwill,

191.   WPI is liable for the damages they have caused and continueto cause.

## **COUNT VII**

## **INTENTIONAL INFLICTION OF EMOTIONAL**

## **DISTRESS**

192.   Bray incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

193.   The intentional acts described above and attributable to the Defendant were extreme, outrageous and beyond the scope of common decency and were intended to cause Bray severe emotional distress.

194.   As a result of the Defendant's conduct, Bray suffered severe damages which no reasonable person or persons should be expected to tolerate.

195.   This Defendant are liable for the damages they have caused and continue to cause.


## **COUNT VIII**

## **NEGLIGENT INFLICTION OF EMOTIONAL**

## **DISTRESS**

196.   Bray incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

197.   The negligent acts set forth above are directly attributable to this Defendant.

198.   The negligent acts by this Defendant caused Bray emotional distress.

199.   As a result of the Defendant's conduct, Bray suffered physical symptoms of his emotional distress which any reasonable person would have suffered under the same circumstances.

200.   This Defendant is liable for the damages they have caused and continue to cause.

## COUNT IX

## CIVIL CONSPIRACY

201.   Bray incorporates by reference in their entirety all previous and subsequent paragraphs of this Complaint.

202.   Defendant, in conjunction with Ms. Smith and Dean Perlow, knowingly participated in their tortious plan to improperly prevent Bray from graduating in good standing by manner of defamation, tortious interference with business relations and prospective economic advantages, breaches of covenants of good faith and fair dealing, andunfair business practices.

203.   Bray has been harmed by Defendant's actions by, inter alia, lost income,loss of goodwill, reputation, and consulting engagements.

204.   Defendant is liable for the damages they have caused and continue to cause.

## COUNT X

## TITLE IX

205.   Plaintiff incorporates by reference above and below paragraphs.

206.   Title IX prohibits discrimination on the basis of sex, "under any program or activity

receiving federal financial assistance." 20 U.S.C. § 1681(a).

207. WPI is a program or activity receiving federal financial assistance.

208. Title IX has been given the broadest possible effect to ensure maximum protection against sex discrimination in education.

209. The WPI rules violate Title IX. 121.

210. The negative effects of having an entire class of people be declared by the United States Secretary of Education to be unworthy of equal protection against discrimination and fully equal treatment under civil rights laws negatively affects the rights of all individuals subject to sex based harms with regard to their access to educational opportunities, benefits, programs, and activities as a direct result of the WPI rules.

211. The individual plaintiff has legal matters pending that will be negatively affected by the WPI rules.

212. Plaintiff's Title IX claim is a challenge to Defendant's policy on the grounds that the WPI rules are facially discriminatory.

213. Thus, deliberate indifference need not be shown.

214. The mere existence of a facially discriminatory policy creates a hostile environment in all educational opportunities, benefits, programs, and activities for all individuals protected by Title IX.

215. Defendant has the ability to remedy the discriminatory WPI rules.

## COUNT VIII

### Violation of G.L. c. 93, § 102, Massachusetts Equal Rights Act

216. Plaintiffs incorporates by reference above and below paragraphs.

217. The individual plaintiff has a right to receive full and equal treatment under

Massachusetts law, including "the full and equal benefit of all laws and proceedings for the security of persons …"

218. Defendant promulgated rules intentionally, recklessly, and/or negligently that apply exclusively to sex-based harms and that deny the individual Plaintiffs "full and equal benefit of all laws and proceedings for the security of persons…."

219. As a direct and proximate result of the Defendant's conduct, the individual Plaintiff has suffered personal injuries to his rights, and will continue to suffer these injuries to rights in the future.

## COUNT IX

### Violation of Mass. Const. Pt. 1, Art. I,

### Equal Protection

220. Plaintiffs incorporate by reference above and below paragraphs. The individual plaintiffs have a right to enforcement of the law consistent with the dictates of the Massachusetts Constitution's guarantee of equal protection. 134. Defendants discriminated against Plaintiffs on the basis of their sex and violated their rights to equal protection of the laws by issuing the DeVos rules. 135. Congress, and thus the DOE, lack authority to regulate violence against women. U.S. v. Morrison, 529 U.S. 598 (2000) (Congress has no authority to regulate violence against women under civil rights laws or the Commerce Clause). 136. Under the Spending Clause, Congress, and thus the DOE, have exceeded their authority by imposing too heavy a burden on Massachusetts as a quid pro quo for receiving federal funds. N'tl Federation of Independent Business v. Sebelius, 567 U.S. 519 (2012). 137. As a direct and proximate result of Defendants' conduct, the individual Plaintiffs have suffered legal injuries to their rights, and will continue to suffer injuries

to their rights in the future

## COUNT X

### 42 U.S.C. § 1983

### Due Process

221.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

222.     As described more fully above, Defendant, while acting individually, jointly, and in conspiracy, as well as under color of law, deprived Plaintiff of his constitutional right to a fair hearing.

223.    In the manner described more fully above, the Defendant deliberately withheld exculpatory evidence, held a hearing where the complainant also sat on the hearing panel, as well as fabricated false reports and other evidence and ignored reports and witness testimony presented by the plaintiff, thereby misleading and misdirecting the prosecution of Plaintiff.

224.    Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

225.    The Defendant's misconduct also directly resulted in the unjust conviction of Plaintiff, thereby denying him his constitutional right to a fair hearing, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

226.    As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered severe damages as is more fully alleged above.

227.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

228.   The misconduct described in this Count was undertaken pursuant to the policy and practice of the WPI Code of Conduct in the manner described more fully above.

WHEREFORE, Plaintiff Bray. respectfully requests that this Court:

(1) Enter judgement in his favor on each count of this Complaint;

(2) Award him damages in an amount to be determined at trial with interest at 12% perannum from the date of filing;

(3) Award him treble damages where appropriate;

(4) Award him attorneys' fees, expert fees, and costs;

(5) Award injunctive relief pursuant to Mass. General Laws c. 51B reinstating Bray to the same standing he held before WPI's action, with full benefits, rights, and privileges;

(6) Award injunctive relief requiring Defendant to withdraw any finding that he violated the following: Disciplinary, Section IV: Policies Regarding Student Behavior/Letter Q: Physical Abuse and Reckless Endangerment Violation; Disciplinary, Section III: Standards of the WPI Community/Failure to Foster and Maintain Mature Interpersonal Relationships; Disciplinary, Section III: Standards of the WPI Community/Failure to Engage Respectfully and Civilly with the Community.

(7) Award injunctive relief requiring Defendants to withdraw all sanctions be removed in their entirety, including, Removal from campus community, forced Intimate Partner Abuse Education Program (IPAEP) requirement, forced Campus Housing Board (CHB) recommendation that the respondent be removed from consideration from any awards, honors of distinction, or highlights associated with WPI, and Deferred disciplinary suspension.

(8) Grant Bray such other and further relief as the Court deems just and appropriate.

(9) Plaintiff demands trial by jury on all issues so triable.

Dated: May 13, 2021

Respectfully submitted,

Mark Bray

Through his Attorney,

s/ Adam Beck, Esq.

102 Osgood St

Andover, MA 01810

978.807.3202

Dradambeck2010@gmail.com

CERTIFICATE OF SERVICE

On May 13, 2021, the undersigned attorney caused the foregoing Complaint to be filed electronically with the United States District Court for the District of Massachusetts, which will be thereby served upon all parties registered to receive notice via the
Court's CM/ECF system, or in the alternative service through the Constable. In addition, the undersigned attorney served both paper and electronic copies of the foregoing Complaint via e-mail and via U.S. mail (first class,
postage prepaid), upon the Defendant in this matter. Defendant's contact information is as follows:

David Bunis
Senior VP & General Counsel
100 Institute Road
Worcester, MA 01609
Email: dabunis@wpi.edu
Tel: 508.831.4993

Matthew Thaler
Deputy General Counsel
100 Institute Road
Worcester, MA 01609
Email: mjthaler@wpi.edu
Tel: 508.831.5000 x6210

Dated: May 13, 2021
s/ Adam Beck
Counsel for Plaintiff

CERTIFICATION UNDER LOCAL RULE 7.1(a)(2)

On May 13, 2021, undersigned counsel for Bray contacted Defendant to request Defendant to be present for a hearing before May 20, 2021.  Defendant's Counsel has not returned a telephone call. Accordingly, the parties were not able to resolve or narrow the issues presented by this motion in advance of filing.


Dated: May 13, 2021
s/ Adam Beck
Counsel for Plaintiff