# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| **MARK BRAY,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIV. ACT. NO. 21-40049-TSH** |
| ) | |
| ) | |
| ) | |
| **WORCESTER POLYTECHNIC INSTITUTE and** ) | |
| **LAURIE LESHIN, PRESIDENT OF WORCESTER** ) | |
| **POLYTECHNIC INSTITUTE,** ) | |
| **Defendant.** ) | |
| _____ ) | |

## MEMORANDUM OF DECISION AND ORDER
### March  30, 2022

**Hillman, D.J.**

## Introduction

Mark Bray ("Bray" or "Plaintiff") has filed a Second Amended Complaint against

Worcester Polytechnic Institute ("WPI"), and Laurie Leshin, President of WPI ("President

Leshin") alleging claims for violation of the Mass.Gen.L. ch. 51B, the Massachusetts Fair

Housing Act (Count I), Libel (Count II), Breach of Contract (Count III), Breach of the Covenant

of Good Faith and Fair Dealing (Count IV), Tortious Interference with Business (Count V),

Tortious Interference with Prospective Economic Advantage (Count VI), Intentional Infliction of

Emotional Distress (Docket  VII), Negligent Infliction of Emotional Distress (Count VIII),

violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a) ("Title IX")

(Count IX),  violation of Mass.Gen.L. ch. 93, §102, the Massachusetts Equal Rights Act, (Count

X), Violation of the Equal Protection Act, the Massachusetts Declaration of Rights Pt. 1, Art. 1 (Count XI), violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. ("Title VI") (Count XII), and Negligence (Count XIII). Bray asserts that this Court has jurisdiction over the action because he has alleged claims under federal law, . *i.e.*, violation of Titles VI and IX.

Bray's suit against the Defendants arises out of disciplinary measures imposed against by WPI in connection with a complaint brought against him by a fellow student. More specifically, a white female ("E.S.") filed a complaint against Bray (an African American male) for his having allegedly groped her breast at an off-campus party. After a hearing held pursuant to procedures set forth in the WPI Student Code of Conduct ("Code"), Bray was found to have acted in violation of the Code and sanctioned. Bray's claims arise out of the hearing procedures afforded to him and the discipline imposed.

This Memorandum of Decision and Order addresses Defendants' Motion to Dismiss All Claims With Prejudice. For the reasons set forth below, that motion is *granted,* in part (Plaintiff's federal claims are dismissed). Defendants' motion to dismiss Plaintiff's state law claims on the merits is *denied,* however, those claims are dismissed *without prejudice* for lack of jurisdiction.

### **Standard of Review**[1]

On a Rule 12(b)(6) motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175

---

[1] In setting forth his understanding of the applicable standard of review, the Plaintiff has cited to Massachusetts case law. Moreover, in his arguments, he at times makes reference to the standard applicable to motions for summary judgment under Fed.R.Civ.P. 56. The Court has set forth the applicable standard of review and assumes that Plaintiff is aware of that standard and understands that to the extent that the Massachusetts law he cites is not coextensive with federal law, tthe federal standard governs.

F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 127 S.Ct. 1955 (internal citations omitted). The standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

 "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009) (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1855).  Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief."  *Ruiz Rivera v. Pfizer Pharm.*, LLC, 521 F.3d 76, 84 (1st Cir. 2008) (internal quotations and original alterations omitted).  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernàndez v. Fortuño-Burset,* 640 F.3d 1, 13 (1st Cir. 2011).

 [The remainder of this page had intentionally been left blank.]

**Facts** [2, 3]

The Encounter Between Bray and E.S.

On the night of November 7, 2020, Bray, then a student at WPI, attended an off-campus party where he consumed alcohol and interacted with another WPI student, E.S. After the party, Bray learned that E.S. had told  other students that he had grabbed her breast during the party, an incident about which Bray had no memory. Because Bray "felt so guilty over the idea that anything like the described incident may have happened," Bray asked one of his friends to call E.S.  Bray spoke with E.S. and told her that he "did not remember the incident," and he "apologized if [E.S.] in any way was uncomfortable." E.S. "was angry at the conversation and did not accept the apology," and she told Bray that she was still deciding whether to raise an official complaint against him. E.S. subsequently filed a complaint under the Code, in which she alleged that, during the party, Bray reached under her shirt and "grabbed [her] breast" as E.S. was walking by Bray and his girlfriend (hereafter, the "Incident").

---

[2] In support of its motion to dismiss, WPI has submitted matters outside of the pleadings, including a copy of the Code, a copy of a notice sent to Bray, a redacted copy of  a prehearing packet prepared for the hearing panel, and copies of email correspondence. *See* Aff. of Mark Macchi In Sup. Of Defs' Mot. To Dism. All Claims With Prejudice (Docket No. 40), attached as *Exs.* 1-4.  In ruling on whether the plaintiff has stated an actionable claim, the inquiring court must consider only the complaint, and documents annexed to it. If the parties include matters outside the pleadings which are not excluded by the court, then the motion must be converted to one for summary judgment. *See* Fed.R.Civ.P. 12(d).  However, in deciding a motion to dismiss, the court may consider "documents the authenticity of which are not disputed by the parties;  … official public records; … documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). The Court agrees with the Defendants that the documents which they have included are incorporated by reference in Plaintiffs' Second Amended Complaint and, therefore, may be considered in deciding their motion. Moreover, while the Court has accepted Plaintiffs' "well pleaded facts," to the extent the allegations contained in the Second Amended Complaint conflict with documentary evidence properly before the Court, the Court has not adopted Plaintiffs' asserted facts, but rather has made factual findings in accordance with the documentary evidence.

[3] The Court notes that a Transcript of the hearing is attached to the Second Amended Complaint. The Court's references to testimony from the hearing as well as summaries of hearing procedures were taken from the Transcript.

<u>The WPI Student Code of Conduct: E.S. Files a Complaint against Bray and a Hearing is Held
Before the CHB Panel</u>

The Code is publicly available and accessible on the internet.  Pursuant to the Code, each

WPI student is responsible for reading and understanding WPI's expectations, which are

documented therein. By enrolling at WPI, students voluntarily agree to comply with the

standards of performance and behavior described in the Code and in WPI's policies. The most

updated version of the Code is published online. It states within the Code that students with

questions or concerns about the Code can contact WPI administration.

The Code provides the process for resolving matters "in which students . . . allegedly

violate the standards of the WPI community." Under the Code, any person may submit a written

complaint to the Dean of Students Office alleging that another student violated the Code or other

WPI policy or standard (a "Complainant"). The Code provides that after a complaint is received,

WPI will provide written notice to the accused student (the "Respondent"), advise the

Respondent of the details of the alleged violation, and invite the Respondent to schedule a

meeting with a "Conduct Officer."

On February 17, 2021, Bray received a letter (the "Notice Letter") from WPI Assistant

Dean of Students Emily Perlow ("Dean Perlow") informing him that he was being charged with

three violations of the Code in connection with E.S.'s allegation that he grabbed her breast at the

party on November 7th. The Notice Letter specifically informed Bray that he had been "charged

with alleged violations of the WPI Code of Conduct" and identified the specific sections of the

Code that he was alleged to have violated. After receiving the written notice of the charges

against him, Bray attended an administrative hearing with Dean Perlow, who served as the

Conduct Officer for E.S.'s complaint. Because the charges were not resolved after the

administrative hearing, the matter proceeded to a hearing before a panel of the Campus Hearing Board ("CHB").

The Code provides that a CHB hearing will be scheduled as soon as reasonably possible based on the availability of the Complainant, Respondent, and CHB members, and that the Respondent is to be provided written notice of the hearing.  Consistent with these provisions, Bray received written notice via email of the scheduling of a CHB hearing on April 22, 2021. Over a month before the CHB hearing, Bray was offered a staff member, Tracy Baldelli, to serve as his advisor, and Bray met with Ms. Baldelli twice (once in early March 2021, and once a few days before the April 22nd hearing). Further, on April 1, 2021, Bray was emailed information concerning the date, time, and Zoom link for the CHB hearing, as well as information identifying the Chair of the CHB panel, the members of the CHB panel, the alternates for the panel, and the case officer. E.S. knew Dean Perlow and some member of the CHB panel (including the designated Chair) because she has previously participated in disciplinary proceedings for other students, that is, she served on the CHB panel or was otherwise involved the in the administrative aspect of other student's disciplinary hearings.

The Code outlines the procedures to be observed before and during a CHB hearing. Among other things, the Code provides that three days before the hearing, each party may submit documents that the party intends to submit at the hearing (which collectively comprise a "Prehearing Packet"). The Complainant, Respondent, and CHB panel members are given access to the Prehearing Packet before the hearing. Before the April 22nd  hearing, E.S. and Bray submitted documents for inclusion in the Prehearing Packet. In his Prehearing Packet, Bray submitted a "character reference" from a professor and three identical statements from individuals (identified as C.B., S.K. and O.C.) who attended the November 7th party.  In their

statements, C.B., S.K., and O.C. stated that they "never saw" Bray and E.S. "alone together" and "never saw" Bray "touch" or "engage in a sexual manner" with E.S.

The Code also describes the procedures that will be "generally adhere[d] to" during the hearing. Per the Code, the hearing begins with the Chair reading the alleged violations of the Code and asking the Respondent to plead either "Not Responsible" or "Responsible." Thereafter, both the Complainant and Respondent are provided an opportunity to make an opening statement, to call witnesses, to present evidence, and to make a closing statement. The Code further provides that the CHB panel and/or Chair may ask questions of the witnesses and the parties to aid in their decision-making, and that, in the discretion of the Chair, the parties may directly or indirectly question each other. Pursuant to the Code, the Complainant and Respondent are responsible for notifying their witnesses of the hearing.

Bray's hearing before the CHB panel occurred over Zoom[4] and lasted several hours. At the start of the hearing, the Chair of the panel, Professor Joel J. Brattin ("Chair Brattin"), asked Bray and E.S. to introduce themselves, to identify any witnesses they intended to call, and to state whether they had an advisor present. Bray identified himself, stated that he intended to call five witnesses (R.D., M.A., O.T., A.S., and E.E.)[5], and that he had an advisor present with him who he identified as Isabel Cello[6]. Bray further stated that there were not "any other person or persons relevant to [Bray's] role in the hearing."

Chair Brattin then described the voting process, introduced the voting members of the CHB panel, and asked E.S. and Bray whether they wanted to "request the exclusion" of any of

---

[4] The Court notes that at the time of Bray's hearing in April 2021, proceedings at WPI and elsewhere were largely conducted remotely due to the COVID-19 pandemic.

[5] A.S. was Bray's girlfriend and R.D. M.A. O.T. and E.E. were friends who were also at the party.

[6] Bray brought his own advisor rather than Tracy Baldelli (the advisor who had been provided to him by Dean Perlow).

the panel members.  Both Bray and E.S. responded that they did not wish to request the

exclusion of any of the panel members. Chair Brattin went on to read the statement of

charges for Bray's alleged violations of the Code and, after reading each individual charge, asked

Bray whether he understood the charge and how he pled. After each charge was read, Bray stated

that he understood the charge and pled "not responsible." E.S. and Bray then made their opening

statements, with Bray's statement longer than E.S.'s. In her opening, E.S. briefly described the

Incident and the difficulty she reportedly experienced in coming forward with her complaint.

Bray did not focus on the Incident, rather he used his opening to describe his accomplishments

honors, distinctions, awards, research and job at WPI.[7]  Thereafter, E.S. presented her evidence.

E.S. described the Incident stating that she "vividly remember[ed]" the events in

question. She testified that as she was walking past Bray and his girlfriend in a narrow hallway,

Bray reached under E.S.'s crop t-shirt and grabbed her breast. E.S. also testified that later during

the party, she told another attendee, R.D., that she was "pretty sure Mark [Bray] just like grabbed

my boob," to which R.D. responded, "Yeah, he did." E.S. then presented screenshots of several

contemporaneous text messages that she sent to friends after the November 7th party, in which

she referenced Bray "grabbing [her] boob" and said that she "wish[ed] [she] slapped him."

During her testimony, E.S. testified that because of the type of shirt she was wearing, it "wasn't

---

[7] After Bray had spoken for some time, Chair Brattin interjected: "Mark, I'm really sorry to interrupt you here, but this is really a, an opportunity for you to make a brief opening statement describing the events that the complainant claims constitute a violation of the WPI Campus Code. Of course, you can bring forth whatever evidence you like at a later point, but this is the time for a brief opening statement describing the events the complainant claims constitute a violation of the [Code.]" Bray responded that he felt it was "important to provide background" and was "almost done."  He then went on to read a recommendation letter, describe having appeared on WPI's official Instagram page three times, describe a complimentary anecdote from another student, and describe the challenges to his success. At this point, Chair Brattin asked Bray if he could provide an "opening statement responding to the charges."  Bray continued his opening but did not address the Incident, eventually concluding, "I have more—I would have more to present as the hearing goes on."  I agree with Defendants that these two, brief interjections by Chair Brattin contradict Bray's assertion in the Second Amended Complaint that he "was repeatedly cut off mid-statement."

hard" for Bray to grab her breast.[8]  E.S. then called her first witness, R.D., whom Bray had also designated as a witness.

R.D. gave a statement identifying himself as Bray's friend from the track team and said that he first met E.S. on the night of the party.[9] R.D. testified that he, Bray, and E.S. were in the hallway, and that he saw Bray "move towards" E.S. In describing what happened next, R.D. testified, "I remember hearing and then seeing E.S. reacting in an angry manner towards Mark ... I believe E.S. yelled at Mark saying, 'What the fuck?' or something similar."   R.D. further testified that he spoke with E.S. sometime later at the party, and that E.S. asked R.D. if he "saw what Mark did." R.D. then testified: "I had said I did but did not know the specifics of what happened. Then she told me Mark went under her shirt and grabbed her. I was unsure if that had happened, but remember something happening."  RD was then questioned by panel members, E.S., and Bray. During questioning by the panel, R.D. later clarified that E.S. had said that Bray "went under her shirt and grabbed her boob." Upon completing his questioning of R.D., Bray stated, "I think that's all the questions I had for you specifically."

Next, E.S. called another student who attended the party, O.T., whom Bray had also designated as a witness. O.T. stated that he did not see "anything happen" between Bray and E.S. at the party, but that he received a Snapchat message from E.S. the day after the party that "stayed in [his] memory." In that message, E.S. reported to O.T. that Bray had "grabbed her, her breast." O.T. testified that after E.S. sent him this Snapchat message, O.T. told her, "that doesn't

---

[8] Bray asserts in the Second Amended Complaint that it would have been impossible for him to get his hand under E.S. shirt to grope her breast as she passed him. However, in addition to E.S.'s testimony, A.S., Bray's girlfriend, testified that E.S. was wearing a crop t-shirt that "barely covered her breasts." A.S. also noted that E.S. was not wearing a bra and stated that her attire was inappropriate. Based on the evidence adduced at the hearing, I cannot accept as a fact Bray's assertion that it would have been impossible for him to get his hand under E.S.'s shirt to grab her breast.

[9] Each of the witnesses gave an opening statement and thereafter, was subject to questions by the panel, E.S. and Bray.

sound uncommon for drunk Mark." O.T. stated that after his conversation with E.S., he contacted and questioned Bray, who said that he "had no recollection of that incident. Just no memory whatsoever." O.T. testified that he and his roommate M.A. spoke to Bray, and that the three "consider[ed] that Mark had blacked out due to alcohol," which was "sort of the only reason that [they] could come up with." O.T. stated that he remembered Bray "saying just he felt like so awful that this could have potentially happened, that he just wanted to like apologize immediately like if it had happened." O.T further testified that he and M.A. told Bray that he should "probably contact" E.S., and that Bray then called E.S. from O.T.'s phone (with both O.T and M.A. present) and "apologized if anything happened."

After O.T. gave his statement, the panel, E.S. (who declined to ask any questions) and Bray had an opportunity to examine him. After the panel finished questioning O.T., Bray acknowledged that he was "intoxicated" during the party but contended that he did not "think [he] was uncontrollably drunk to the point that [he] would forget the events of the night." However, during questioning by Bray, O.T. stated that during their telephone conversation with E.S., Bray "might've stated that there was a chance" that he was "browned or blacked out" at the time of the alleged Incident.[10] Bray also asked O.T. about whether he felt that Bray's apology to E.S. "sound[ed] sincere." O.T stated that Bray's apology sounded sincere, but that E.S. told Bray that she "didn't accept it" because Bray's behavior was "unacceptable." At the end of his questioning of O.T., Bray stated, "That's all the questions I have for now. Thank you, O.T., for being here."

---

[10] Bray began his questioning of O.T. by quizzing him on his awareness of Bray's personal background (e.g., Bray's birthday, the number of Bray's brothers and sisters, and the languages spoken by Bray), and he later asked O.T. about the particulars of a consensual sexual interaction between O.T. and E.S. On both occasions, Chair Brattin requested that Bray keep his questions focused on matters relevant to the Incident at issue. Before Bray started the presentation of his evidence, Chair Brattin stated, "I would like to start by cautioning you, Mark, to keep the discussion on track. I would like you to know that E.S.'s sexual relationships are out of bounds and inappropriate for you to discuss in this hearing; that's not what this hearing is about."

After O.T.'s testimony, Bray presented his evidence and called witnesses.  Bray reviewed the parties' submissions in the Prehearing Packet and then called his first witness, M.A., who was also present when Bray called E.S. to apologize. M.A. testified that during the call, Bray apologized "very profusely," but that E.S. was "angry" and responded by telling Bray, "This can't happen ever again ... . You should never do this; this is like the wrong way to treat people." M.A. was asked clarifying questions by the panel and given an opportunity to explain his answers. Thereafter, E.S. asked M.A. questions, and, when she concluded, Bray asked M.A. questions.  As he had during the questioning of O.T., Bray elicited testimony from M.A. that Bray had "sound[ed] sincere" in his apology to E.S.  At the end of M.A.'s testimony, Bray stated, "Okay, that is all the questions I have."

Next, Bray called his girlfriend A.S. to testify. In her introductory statement, A.S. said she did not know E.S. At the same time, she characterized E.S.'s allegations against Bray as a "call for attention" and insinuated that E.S. was a racist.[11] A.S. went on to comment on a possible sexual interaction between E.S. and O.T., to assert that E.S.'s behavior had been "rambunctious and loud" at the party, and to criticize E.S.'s attire, which A.S. characterized as "revealing" and "inappropriate."  Regarding the alleged Incident in the hallway described by E.S., A.S. stated that it was "possible" that she and Bray were alone in the hallway, and that she did "not remember" E.S. passing by her. Following A.S.'s remarks and questioning by the panel,

---

[11] Near the end of A.S.'s introductory statement, she asserted that E.S. was "utilizing [Bray]'s race and the stereotype that falls as a black man in a predominantly white institution, to make what she believes is a statement supporting women," and that E.S. saw Bray "as a black man first and Mark Bray second." Panel member John Sanbonmatsu, a professor who identifies as a person of color and teaches critical race theory, asked A.S. whether she had any evidence "that E.S.'s a racist, or that she had ever said or done anything that would lead you to believe she's a racist . . . ." A.S. did not identify any such evidence. This was the only questioning from the panel members during A.S.'s testimony that referenced the topic of race; the remainder of the questioning focused on A.S.'s relationship with Bray and her recollection of the events of November 7th. Later in the hearing, Bray told the panel, "I am not saying that E.S. is a racist."

11

Bray questioned her. Bray concluded the questioning by stating, "That's all the questions I have at this time." E.S. did not question A.S.

Bray's final witness was his friend E.E., who described herself as a "character witness" and "not as someone who was at the incident." After E.E.'s introductory statement, she was asked questions by Bray and the panel. After E.E.'s testimony, Chair Brattin asked Bray: "Mark, do you have another witness you'd like to call?" to which Bray responded "No."

The panel then questioned both Bray and E.S. During this time, Bray noted that a number of the panel members' questions were "good" and "fair." In response to the panel's questions, Bray admitted that he had told E.S. during their phone conversation after the party that he "didn't remember what had happened, and that if it were true, [he was] sorry." Chair Brattin then invited Bray and E.S. "to ask questions of each other" by submitting their questions to him through Zoom's chat function-- he would then pose the question to the other person. The Code explicitly provides for such indirect questioning of each other by the Complainant and Respondent.  E.S. did not have any questions for Bray, but Bray submitted questions, which Chair Brattin posed to E.S.  After Bray's questions to E.S. were asked and answered, Bray made his closing statement, during which he thanked the panel members for their "attention during the hearing and for [their] dedication to making the right decision as it pertains to this case."  E.S. then made her closing statement.  At this point, Chair Brattin offered the parties "one final opportunity" to question each other, which both declined. Chair Brattin advised the parties that the panel would deliberate and "reach a decision based on the evidence and testimony presented," and that Bray would be notified within 24 hours of the panel's decision. The CHB hearing then ended.

<u>The CHB Panel Finds Bray Responsible and Issues Sanctions; Results of Appeal</u>

The Code provides that after the close of the hearing, the panel members are to deliberate and render a decision. Following the hearing, the CHB panel deliberated and found Bray responsible for violating each of the three policies identified in the charge. The CHB panel issued four sanctions to Bray, each of which is set forth in the Code as a potential sanction. Following the CHB's findings, Bray received his engineering degree from WPI with honors.[12]

Pursuant to the Code, Bray submitted a written appeal of the CHB panel's decision to Phillip Clay, WPI's Vice President of Student Affairs ("Vice President Clay")[13]. The Code expressly provides that there are "only three (3) grounds" for an appeal, namely:

> 1. Newly Available Information. Substantive and relevant information exists that was not available to the parties at the time of the decision or could not have been discovered through due diligence at the time of the decision.
>
> 2. Denial of Fair Process. There was a substantial departure from the procedures outlined in the RAP that significantly affected the fairness of the process.
>
> 3. Severity of the Consequences. The sanction varies significantly from the range of sanctions appropriate in the situation.

In his appeal, Bray did not allege that he possessed any new "substantive and relevant information," rather he appealed the CHB panel's decision based on alleged 'Denial of Fair Process' and 'Severity of the Consequences'. In his decision which did not disturb the finding that Bray had committed violations of the Code, Vice President Clay concluded that

---

[12] Although the original sanctions provided that Bray would not graduate with his class, recommended that honors be withheld and suspended issuance of his diploma until December 2021, Bray graduated from WPI with his class on May 20, 2021, and received his degree with honors.

[13] Bray has repeatedly contended that there was no right of appeal from the CHB's findings which led to him filing this lawsuit (in which he originally sought a Temporary Restraining Order to prevent WPI from imposing certain of the sanctions). While Bray certainly had the right to file suit in this Court and assert his claims, given that the Code clearly provides for an appeal *and Bray did in fact file an appeal* to Vice President Clay, his repeated and deliberate assertion that no appeal process exists at WPI blatantly misstates the procedures he was afforded.

"there was no substantial departure from the procedures outlined in the Resolution and Appeals Process," but that, in his assessment, the sanctions imposed on Bray were "not proportionate to the violations of the Code and do not reflect the relief requested by the complainant."

Vice President Clay vacated the sanctions imposed by the CHB "recommend[ing], but [] not mandating, the relief requested by the complainant during the hearing regarding educational opportunities." Vice President Clay also stated that given his decision, the Registrar had "added [Bray's] name to the list of students who have completed their degree requirements and will be voted on by the Faculty at the final Faculty meeting of the year scheduled for May 27, 2021." Vice President Clay concluded his decision stating:

> Pursuant to the Code of Conduct, Section N ("Record Keeping and Reporting"), the Dean of Students Office will retain your conduct record for two (2) years following your date of graduation from WPI and will report your conduct record only with your permission upon request, and in accordance with applicable state and federal laws and regulations. Your academic transcript will not reflect the existence, or outcome of, a student conduct proceeding.

Bray is in the process of applying to medical school. Applications to many if not most schools ask if the applicant has received any discipline while in college. Bray would have to answer in the affirmative which he believes would prevent him from being accepted.[14]

## Discussion

Bray has filed this action in federal court pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) alleging that the Defendants violated his rights under Titles IX (Count IX) and VI

---

[14] Plaintiff's summary of facts does not cite to the page and paragraph of the Second Amended Complaint containing the referenced allegations leaving it to the Court to review that pleading to determine whether such allegations were contained therein. While it is not the Court's obligation to do so, the Court has included those facts asserted by Plaintiff which are contained in the Second Amended Complaint and are not contradicted by the hearing Transcript and the Code. Moreover, Plaintiff has improperly included legal conclusions in his allegations which will not be considered by the Court. Additionally, Bray's suggestion that the motion to dismiss be summarily denied because the Defendants' argument refers to the date of the Incident as November 7th and E.S.'s complaint states it happened on November 8th (he argues that it is therefore not clear that they are referring to the same event) is spurious and not deserving of further discussion.

(Count XII). For that reason, the Court will first address Defendants' motion to dismiss those claims.

<u>Whether Bray has stated a Claim for Violation of his Rights under Title IX</u>

Title IX provides that "[n]o person...shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Among other things, it "'bar[s] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" *See Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2ᵈ Cir. 2016) (citation to quoted case omitted).[15] WPI argues that the Complaint fails to state a claim against it for violation of Title IX because Bray's conclusory allegations that women are "in-practice" presumed more credible and that WPI's hearing procedures are facially discriminatory are insufficient to state plausible claim for violation of Title IX.[16] For the reasons set forth below, I agree.

"Most Title IX cases fall within one of two categories: 'erroneous outcome' and 'selective enforcement.' A third far-less common category of cases are those that proceed upon a "deliberate indifference" theory. *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp.

---

[15] As an initial matter, the Court will address Bray's Title IX claim against President Leshin. While there is implied right of action for injunctive relief and damages under Title IX, such claims may only be asserted against the educational institution, not individuals who work for such institutions. *See Bose v. Bea*, 947 F.3d 983, 988 (6ᵗʰ Cir. 2020), cert. denied, 141 S. Ct. 1051(2021)(Title IX does not provide for individual liability; only "a recipient of federal funds may be liable in damages under Title IX" and "only for its own misconduct.")(quoting Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 640, 119 S.Ct. 1661 (1999)). Therefore, Bray's Title IX claim against President Leshin are dismissed.

[16] As noted by the Defendants, in making this allegation, Bray does not point to any provision of the Code or cite to any specific aspects of his hearing which can be deemed discriminatory. Indeed, the Code on its face is gender neutral. Moreover, as further pointed out by the Defendants, while Bray does assert that the CHB panel and other aspects of the process were biased towards E.S., such allegations are based on the fact that E.S. had previously served on hearing panels involving student discipline and worked with individuals who were a member of the panel that resided over her complaint against Bray. There are no allegations that there was bias against Bray because of his gender.

3d 799, 822 (E.D. Pa. 2017)(internal citations omitted).  As noted above, Bray asserts that its process of giving an "in-practice" presumption that a woman is more credible than a man at campus hearings and its practice of not allowing proper presentation and cross-examination of hearing witnesses is facially discriminatory and violates Title IX. Based on these allegations, Bray appears to be proceeding under a "selective enforcement theory." [17]

In a selective enforcement case, the plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2[d] Cir. 1994). "To state a selective enforcement claim upon which relief can be granted, a male plaintiff must allege that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [educational institution], Thus, a plaintiff can state a claim for selective enforcement by alleging that the [university's] actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same

_____

[17] The Court notes that there is not unanimity amongst the Circuits as to the proper analysis to apply to Title IX claims in the context of student disciplinary proceedings. "In *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994), the Second Circuit set out two theories for Title IX claims of sex discrimination in university disciplinary proceedings: (1) the 'erroneous outcome' theory, under which the plaintiff claims to be 'innocent and wrongly found to have committed an offense,' and (2) the 'selective enforcement' theory, under which the plaintiff claims that 'the severity of the penalty and/or the decision to initiate the proceedings was affected by the student's gender." *Doe v. Samford Univ.*, No. 2:21-CV-00871-ACA, 2021 WL 3617702, at *6 (N.D. Ala. Aug. 15, 2021), *aff'd*, No. 21-12592, 2022 WL 872338 (11th Cir. Mar. 24, 2022)(quoting *Yusuf*, 35 F.3d at 715). Numerous Courts have rejected one or both of the *Yusuf* theories, "instead inquiring simply whether the facts alleged raise a plausible inference that the university discriminated against a student 'on the basis of sex.'" *Id.* The First Circuit has not found it necessary to address the proper framework for analyzing Title IX claims int the context of student disciplinary proceedings. *See Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 90 (1st Cir. 2018)Neither the Supreme Court nor this Circuit have adopted a framework for analyzing claims by students challenging a university's disciplinary procedures as discriminatory under Title IX. We need not establish one at this moment). In *Doe,* the First Circuit noted that the parties had analyzed plaintiff's claims under the *Yusof* theories and therefore, it would do the same. *See Id.* A number of judges in this district have also adopted the *Yusuf* theories in analyzing claims similar to Bray's. *See, e.g.*, *Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 113 (D. Mass. 2021); *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 60 (D. Mass. 2020). Likewise, I will assume that the *Yusuf* theories are the appropriate means for analyzing Bray's Title IX claim against WPI. While it is not clear from his submissions, as discussed, *infra*, I will assume that Bray is invoking both the selective enforcement and erroneous outcome theories.

16

disciplinary proceedings." *Doe*, 270 F.Supp.3d at 824 (internal citations, internal quotation marks and citation to quoted cases omitted).

The Court has previously addressed the viability of Bray's Title IX claim in the context of his motion for a temporary restraining order and found that he was unlikely to succeed on the merits.  In making this finding, I cautioned him that  his failure to allege that any similarly situated female was treated differently than he was fatal to his claim. Thereafter, Bray amended his complaint but did not flesh out any facts which would support a plausible claim for violation of Title IX. Instead, Bray argues that these are the type of claims that should survive a motion to dismiss to permit the plaintiff an opportunity to engage in discovery because the defendant is necessarily in possession of the evidence which would support such a claim. While I agree with Bray's argument in theory, he cannot simply allege a claim for violation of Title IX with barebones, conclusory allegations that fail to even minimally satisfy the elements of his claim. Put another way, to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must assert facts setting forth a plausible claim sufficient to warrant proceeding to  that next step (discovery). Bray has failed to allege such facts and therefore, he has failed to state a claim under Title IX based on selective enforcement.

Bray does not assert as part of his Title IX claim that he was wrongly found to have violated the Code and therefore, it is unclear whether he is asserting that WPI violated his rights under an erroneous outcome theory.[18] However, because Bray has made allegations that he is innocent elsewhere in his complaint, I will assume he is proceeding under this theory. Bray has failed to assert any allegations which would support a finding that gender played a role in the disciplinary process utilized by WPI or the CHB panel's findings.  To reiterate, conclusory

---

[18] It is clear that Bray has not asserted a claim under the "deliberate indifference" theory.

allegations without more are insufficient to state a plausible claim that that gender bias was a motivating factor behind any alleged erroneous finding. *See Id.* at 822-23 (allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. Rather, to state a claim upon which relief can be granted under an erroneous outcome theory, a plaintiff must allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.)(internal quotations and citation to quoted case omitted)); *See also* ; *See also Yusuf*, 35 F.3d at 715 (plaintiffs may plead  selective enforcement and erroneous outcome in the alternative but in neither case do wholly conclusory allegations suffice for purposes of Rule 12(b)(6)). Therefore, Bray has failed to state a claim under an erroneous outcome theory. Accordingly, the Defendants' motion to dismiss is granted.

<u>Whether Bray has stated a Claim for Violation of his Rights under Title VI</u>

Title VI prohibits discrimination "on the ground of race, color, or national origin." 42 U.S.C. § 2000d.  To establish a Title VI claim, a "plaintiff must show, *inter alia*, that the defendant discriminated against him on the basis of race, that that discrimination was *intentional*, and that the discrimination was a *substantial or motivating factor* for the defendant's actions. Under Title VI, an actionable 'discriminatory purpose ... implies more than intent as volition or intent as awareness of consequences ... [it] implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 416 (N.D.N.Y. 2019)(internal citations, internal quotation marks and citations to quoted cases omitted).  In order to state a claim for violation of Title VI, a plaintiff must allege facts

18

demonstrating intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 280, 121 S.Ct. 1511 (2001) (stating that Title VI "prohibits only intentional discrimination").[19]

Bray asserts that WPI discriminated against him based his race by not offering him the opportunity to have persons of different races available on the CHB panel and by giving him late notice of the hearing such that he was unable to procure an attorney to represent him during the proceedings. Such allegations fall far short of stating a plausible claim for violation of Title VI. In his opposition to Defendants' motion, Bray argues that his Title VI claim is supported by allegations in his complaint that following the CHB decision, other WPI students have raised issues of racial and sexual inequality with respect to discipline imposed by WPI. These allegations are based on screenshots of multiple communications made on social media (copies of which are attached to the complaint), some of which suggest that the poster was aware of cases where white men have been treated more leniently by WPI with respect to alleged claims involving sexual harassment or abuse. However, the social media postings contain conclusory allegations and do not provide any information which would suggest that such cases were similar to Bray's. Moreover, while Bray has made such assertions elsewhere in the pleading, as stated previously, he does not tie those allegations to his Title VI claim. More importantly, even reading those allegations into his Title VI claim, Bray has failed to allege that WPI acted intentionally which is fatal to his claim. Finally, Bray's conclusory, unsupported allegation that under WPI's disciplinary proceedings the allegations made by E.S. a white woman were presumed valid and he, a black man, was not afforded a presumption of innocence are insufficient to state a plausible claim.

---

[19] As with his Title IX claim against President Leshin, Bray's Title VI claim against her must be dismissed because there is no individual liability under Title VI. *See Whitfield v. Notre Dame Middle Sch.,* 412 F. App'x 517, 521 (3ᵈ Cir. 2011)(no individual liability under Title VI).

As with Bray's assertions relating to his Title IX claim, the barebone, minimal allegations and conclusory allegations set forth in the Second Amended Complaint simply do not state a plausible claim for violation of Title VI. Accordingly, Defendants' motion to dismiss is *granted.*

<u>Plaintiffs' State Law Claims</u>

Plaintiff has asserted that this Court has jurisdiction over this action based on federal question jurisdiction. The Court has dismissed both Bray's Title IX and Title VI claims leaving only state statutory and common law claims. The question thus becomes whether this Court should exercise supplemental jurisdiction over those claims.

"As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit ... will trigger the dismissal without prejudice of any supplemental state-law claims. Federal courts may retain jurisdiction in appropriate cases but, before doing so, must consider the interests of fairness, judicial economy, convenience, and comity, the last of which is a particularly important concern in these cases. Courts may also consider whether the state law issues are novel or sensitive. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. [U]nder this standard, it can be an abuse of discretion -- if no federal claim remains -- for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts. *Lambert v. Fiorentini,* 949 F.3d 22, 29 (1st Cir. 2020).

This action is at its early stages (no scheduling order has issued, no discovery has commenced), and there are no statute of limitations issues barring Bray from refiling in state court  if the Court declines to exercise jurisdiction over his state law claims. Therefore, factors

20

such as fairness and judicial economy are essentially neutral.  Convenience slightly favors this Court retaining jurisdiction as the matter is here and the Court is familiar with the issues. Comity, which the First Circuit has noted to be an important factor, favors this Court refusing to retain jurisdiction over the state law claims as some of the issues arising thereunder, if not novel, are certainly complex. On balance, the Court finds after  considering the applicable factors that it should not exercise supplemental jurisdiction over the Plaintiff's state law claims.

Defendants' motion to dismiss Bray's state law claims on their merits is denied. Those claims shall be dismissed for lack of jurisdiction, such dismissal being without prejudice.

### Conclusion

Defendants' Motion to Dismiss All Claims With Prejudice is *granted* as to Plaintiff's federal claims (Counts IX and XII) and *denied* as to Plaintiff's remaining counts which allege claims for violation of Massachusetts law. The Court shall not retain supplemental jurisdiction over Plaintiff's state law claims which are hereby *dismissed without prejudice* for lack of jurisdiction.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**